**SO ORDERED: December 23, 2010.**



               **Anthony J. Metz III**
               **United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CHRISTOPHER PAUL WHITE | ) | CASE NO. 09-10289-AJM-7 |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| THE NATIONAL BANK OF | ) | |
| INDIANAPOLIS | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding |
| | ) | No. 09-50511 |
| vs. | ) | |
| | ) | |
| CHRISTOPHER PAUL WHITE | ) | |
| | ) | |
| Defendant | ) | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER
ON PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT**

The Plaintiff, the National Bank of Indianapolis ("NBI") filed a two-count

nondischargeability complaint against debtor Christopher Paul White ("White") under

1

§§523(a)(2)(A) (Count I) and 523(a)(6) (Count II) for damages arising out of a check delivered by White which was returned for insufficient funds.  White asserted various affirmative defenses in his answer and counterclaimed, alleging, among other things, that it was NBI's practice to cover overdrafts by transferring funds from certain accounts, some from which NBI took without authorization ("White's Counterclaim").  NBI has moved for summary judgment on both Count I and White's Counterclaim.

### *Findings of Fact*

The facts material to NBI's motions, to which there is no material dispute, are as follows:

1.      White was the sole shareholder, president and secretary of Reffco II, Inc., which, in turn was the general partner of Reffco II LP ("Reffco LP").

2.      Reffco LP maintained a checking account at NBI (the "Account") for which White was the sole authorized signatory. Both White and Reffco LP were joint and severally liable for deficiencies in the Account resulting from overdrafts, as well as costs incurred by NBI to collect any deficiency.

3.      On January 3, 2008, White deposited into the Account a check made payable to Premier Properties USA, Inc. ("Premier") in the amount of $500,000 (the "Check") which had been drawn on the account of HPT, LLC ("HPT").  NBI honored the Check and credited the Account for its amount.  Unfortunately for both NBI and White, the Check was presented for payment and dishonored down the line for insufficient funds.  By that point, NBI had honored other checks drawn on the Account, which resulted in an overdraft to the Account amounting to $382,486.17.

4.      NBI's counsel made demand of White by letter of March 20, 2008 that he

pay the overdraft of $382,486.17.  NBI and White had communications about resolving the deficiency in the Account.  When none resulted in payment of the overdraft, NBI sued White in the Marion Superior Court (the "State Court Action").  The State Court Action alleged ten (10) separate counts (the "State Court Complaint"), of which the following are relevant here: (1) Count I, Check Deception; (2) Count 2, Check Fraud; (3) Count III, Criminal Mischief; and (4) Count IV, Defrauding Financial Institutions (the "State Court Counts").

5.      Initially, White was represented by counsel in the State Court Action and answered the State Court Complaint, asserting affirmative defenses, including a claim for setoff.

6.      NBI moved for summary judgment in the State Court Action.  White's response to NBI's summary judgment motion was due on June 24, 2008 and the summary judgment motion was set for hearing to be held on August 11, 2008.  The State Court granted White's counsel's request to withdraw its representation on June 23, 2008, the day before White's response was due.

7.      White neither responded to the summary judgment motion nor moved for an extension of time in which to respond.  On June 25, 2008, partial summary judgment in the amount of $2,000,000 (the amount of the NSF check – $500,000 - plus treble damages of $1,500,000) was entered on behalf of NBI and against White on the State Court Counts (the "State Court Judgment").

8.      About the same time the State Court entered the State Court Judgment, a criminal action was filed against White.  On August 18, 2009, a jury convicted White of fraud on a financial institution, check fraud and theft.  The check fraud and theft counts

were merged into the fraud on a financial institution count (the "Criminal Conviction"). As a result of the Criminal Conviction, White was ordered to pay restitution to NBI in the amount of $382,486. The Criminal Conviction currently is on appeal.

### *Conclusions of Law*

### *Summary Judgment Standard*

1.      Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law". Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed.2d 265 (1986). The moving party bears the burden of showing that no genuine issue of material fact is disputed, but once the moving party has met this burden, the nonmoving party must set forth specific facts demonstrating a disputed material fact for trial and cannot merely rely on denials in its pleadings. If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial", summary judgment will be entered against it. *Celotex,* 477 U.S. at 322.

2.      NBI alleges nondischargeability under Section 523(a)(2)(A) which excepts from discharge a debt "for money....to the extent obtained, by false pretenses, a false representation, or actual fraud...". NBI asserts that the State Court Judgment conclusively determined the issue of "actual fraud" for §523(a)(2)(A) purposes and that White is estopped from relitigating that issue in this proceeding.

4

*Collateral Estoppel*

3.      The State Court Judgment is entitled to full faith and credit in this proceeding because a federal court, including a federal bankruptcy court,  "must give to a state court judgment the same preclusive effect as would have been given that judgment under the law of the state in which the judgment was rendered".  *In re McHenry (McHenry v. McHenry)*, 131 B.R. 669, 673, quoting *Migra v. Warren City School District Board of Education*, 465 U.S. 75, 81, 104 S.Ct. 892,896, 79 L Ed.2d 56, 63 (1984); *In re Staggs, (Forrester v. Staggs),* 178 B.R. 767, 773 (Bankr. N. D. Ind. 1994).

4.      Indiana recognizes both claim preclusion (res judicata) and issue preclusion (collateral estoppel).  "Res judicata" forecloses all that which might have been litigated previously, whereas "collateral estoppel" forecloses relitigation only of those facts or issues actually and necessarily decided in a prior suit.  *Brown v. Felson*, 442 U.S. 127, 99 S.Ct. 2205, 60 L. Ed. 2d 767 (1979).  Given the unique nature of nondischargeability proceedings whereby determination of nondischargeability is exclusively a question of federal bankruptcy law, *Brown* held that res judicata does not apply in dischargeability cases, but collateral estoppel does.  *Id*. at 139, n. 10.  *Grogan v. Garner*, 498 U.S. 279, 285, n. 11; 111 S.Ct. 654, 658 n. 11, 112 L.Ed.2d 755 (1991).

5.      In Indiana, a party wishing to use collateral estoppel must make a threshold showing that (1) the issue in the current action is identical to that in the prior action; (2) the issue was actually litigated; (3) the resolution of the issue in the first action was necessary to the judgment and (4) a final judgment determined the issue in

the prior action.  *Staggs,* 178 B.R. at 774; *In re Busick*, 264 B.R. 518, 522 (Bankr. N. D.

Ind. 2001); *In re Luedtke*, 429 B.R. 241, 250 (Bankr. N. D. Ind. 2010).

### *Offensive Use of Collateral Estoppel*

6.       Once this threshold issue is resolved, the Court then considers whether

the party arguing for estoppel wants it applied offensively or defensively, as Indiana

recognizes the use of both.  *Tofany v. NBS Imaging Systems, Inc.,* 616 N.E.2d 1034,

1037 (Ind. 1993).  Offensive collateral estoppel is where the plaintiff "seeks to foreclose

the defendant from litigating an issue the defendant had previously litigated

unsuccessfully" and defensive collateral estoppel is where the defendant "seeks to

prevent a plaintiff from asserting a claim which the plaintiff had previously litigated and

lost".  *Id.; Bartle v. Health Quest Realty VII,* 768 N.E. 2d 912, 917 (Ind. Ct. App. 2002).

7.       The use of offensive collateral estoppel, as NBI seeks here, is thought to

be "more problematic" than the use of defensive collateral estoppel because "it does

not promote judicial economy in the same manner as the defensive use of collateral

estoppel".  *Parklane Hosiery,v. Shore*, 439 U.S. 322, 329, 99 S.Ct. 645,650, 58 L.Ed.2d

552 (1979).  In determining whether a plaintiff should be allowed to use collateral

estoppel offensively, Indiana has adopted the *Parklane Hosiery* test which considers:

(1) whether the party against whom the former adjudication is sought had a full and fair

opportunity to litigate the issue and (2) whether it would be otherwise unfair under the

circumstances to permit the use of issue preclusion in the subsequent suit.  *Tofany,* 616

N.E.2d at 1038.  *Bartle,* 768 N.E. 2d at 917.  Indeed, cases in this area are somewhat

confusing because the "actually litigated" element of the test to apply collateral estoppel

generally is often assimilated into the "full and fair opportunity to litigate" element considered in allowing the offensive use of collateral estoppel.

8.     In considering whether the defendant against whom the use of offensive collateral estoppel is sought had a "full and fair opportunity to litigate", a court may consider: privity, the defendant's incentive to litigate the prior action, the defendant's ability to defend the prior action, and the ability of the plaintiff to have joined the prior action.  *Tofany*, 616 N.E. 2d at 1038-39.  With respect to the "incentive to litigate", a court takes into account the interest at stake for the defendant in the prior action as well as how the defendant perceived this interest, and whether the forum in which the prior action was defended allowed the defendant to participate in the full range of discovery. *Id*., *Bartle*, 768 N.E. 2d at 918.

9.     To determine the second prong of whether it is otherwise unfair to apply collateral estoppel under the circumstances, a court may look at whether the defendant had little incentive to vigorously litigate the first action, either because the damages were small or nominal or because future suits were not foreseeable; whether the judgment in the prior action is inconsistent with one or more previous judgments in which the defendant was successful; and whether there were procedural opportunities available to the defendant in the second action that were not available to the defendant in the first action which would likely affect the result.  *Tofany*, 616 N.E. 2d at 1038-39.

### *"Full and Fair Opportunity to Litigate"*

10.     White argues that the State Court Judgment should not be given preclusive effect because it was entered as a result of NBI's unopposed motion for summary judgment– in White's view, essentially a default judgment.

11.     The "prevailing trend in Indiana is to expand rather than diminish the availability of collateral estoppel". *Staggs,* 178 B.R. at 777.  Unlike the federal rule concerning federal judgments, Indiana courts have given preclusive effect to findings made in Indiana state court default judgments as long as the defaulted party "could have appeared and defended if he had wanted to" *In re Catt*, 368 F.3d 789, 791 (7th Cir. 2004).

12.     *Catt* involved a scenario similar to this case.  Catt's construction company sued the Hashes for damages arising out of their failure to pay the company their share of housing construction costs.  The Hashes counterclaimed for fraud and filed a third party complaint against Catt personally.  Catt initially was represented by counsel in that action who indicated in a hearing held two and a half weeks before trial that Catt was planning on filling bankruptcy and that he wasn't interested in litigating the company's claim against the Hashes.  The court granted Catt's lawyer's withdrawal of representation the day before the trial.  Catt failed to appear at the trial, but the Hashes were present to pursue their counterclaim against Catt.  The trial was short, and at the conclusion of it, the court adopted the Hashes' proposed barebones findings and conclusions and found fraud and awarded the Hashes $487,045.12 in damages which included punitive damages of $51,000.  After Catt filed bankruptcy, the Hashes filed a §523(a)(2)(A) nondischargeability complaint against him, seeking to use the prior state court judgment to collaterally estop Catt from relitigating the issue of fraud.

13.     The bankruptcy court held that Catt was not collaterally estopped from relitigating the issue of fraud, thus compelling the Hashes to prove fraud again in the nondischargeability case.  The Hashes, instead, rested on their claim of collateral

estoppel, and the bankruptcy court found that the debt was dischargeable.  The district court affirmed the bankruptcy court's judgment.  In reversing, the Seventh Circuit noted that Indiana was in a minority of the states that gave preclusive effect to default judgments.  It noted that '[a]ll that is important in this case given the criteria for precluding relitigation of findings or a judgment are established by the jurisdiction that renders the judgment, is that due process does not require in every case either a hearing or that a particular issue be "actually litigated"; it requires that the party sought to be precluded have had an opportunity for a hearing".  *Id*., at 792.

14.     The Seventh Circuit concluded that Catt had such an opportunity, despite Catt's insistence that he was not aware that his lawyer had withdrawn his representation in the prior action.  The Seventh Circuit found that Catt knew about the trial, had no reasonable grounds to believe the trial would not go forward merely because his counsel withdrew, and could have requested a continuance in order to secure new counsel.  Thus Catt had a "fair chance, which he booted, for a full and fair hearing".  *Id*.

15.     The facts here favor application of collateral estoppel even more so as White's counsel moved to withdraw days before the scheduled trial and served White with a letter which informed White of the intended withdrawal of representation.  White had the incentive to litigate the State Court Action because NBI's complaint alone would have prompted White to sit up and take notice as it asserted White defrauded NBI to the tune of $500,000.  It asserted that the fraud perpetrated was serious enough to award enhanced damages.  A lawsuit seeking $2,000,000, attorney fees, 8% interest and the costs of collection gave White plenty of incentive to litigate as the amount

sought in the complaint was by no means small or nominal.  White also was informed of the consequences of his failure to defend the State Court Action.  His counsel's June 6th letter disclosing their intent to withdraw their representation informed White that he had ten days to procure new counsel.  It also made it abundantly clear that "[y]our failure to hire new counsel may result in a summary judgment against you and possibly other adverse rulings against you....[y]our response to the Motion for Summary Judgment must be filed with the Court on or before June 23, 2008...[t]he Court may grant a summary judgment against you without a hearing if you fail to timely file a response to the Motion for Summary Judgment on or before June 23, 2008".  White failed to respond, and failed to move for an extension of time in which to respond.  Furthermore, nothing in the record indicates that the State Court prevented White from fully participating in defending himself in the State Court Action.  The "full and fair opportunity to litigate" standard is just that....the *opportunity* to litigate, "not whether a litigant put in his best case on the point during the first go-around".  *Staggs*, 178 B.R. at 778; quoting *Kathios v. General Motors Corp.*, 862. F.2d 944, 946 (1st Cir. 1988).  The Court concludes that White had a full and fair opportunity to litigate the State Court Action.

### *"Otherwise Unfair To Apply Offensive Collateral Estoppel Under the Circumstances"*

16.     White argues that his counsel's withdrawal of representation on the eve of the response deadline, NBI's failure to tender to him a copy of the proposed judgment before it was signed, the "barebones" judgment and the preoccupation with the pending criminal action against him at the time render the application of offensive collateral

estoppel "otherwise unfair under the circumstances".  While the conflux of these events

was unfortunate, they do not rise to the level of rendering the application of offensive

collateral estoppel unfair under the circumstances.  White had an incentive to litigate

the State Court Action because it sought a $2,000,000 fraud judgment against him.

There is nothing in the record that suggests that there were any previous judgments in

which White was successful which were inconsistent with the State Court Judgment.

Nor is there any hint in the record that the State Court denied or made unavailable to

him procedural opportunities to defend himself in the State Court Action. [1]

### *Whether State Court Judgment Contains Sufficient Findings to Establish Fraud Under §523(a)(2)(A)*

17.    A debt is excepted from discharge under §523(a)(2)(A) if it was for money,

property or services to the extent obtained by false pretenses, a false representation or

actual fraud.

18.    White's argues that the findings in the State Court Judgment are merely

conclusory and are not detailed enough to establish the necessary §523(a)(2)(A)

elements.  The State Court Judgment generally provided that "the designated

evidentiary matters show that there is no genuine issue as to any material fact

regarding Counts I through X of NBI's complaint and that NBI is entitled judgment as a

---

[1]The Court is compelled to make an observation here with respect to the proceedings leading up to the State Court Judgment.  Summary judgment does not easily lend itself to cases where one's intent to defraud is at issue as intent is a subjective matter, typically an issue of fact.  However, the Court has found that  White was afforded a fair opportunity to defend himself in the State Court Action, and the State Court Judgment was not appealed.  This Court merely determines what issues were actually litigated and does not judge the "accuracy" of the State Court Judgment.  To do otherwise would assume the function of an appellate court, which this Court is not, and come "perilously close to a prohibited reexamination of the substantive deteminations in the state court action".  *Staggs*, 178 B.R. at 778, quoting *Lehman's, Inc. of Anderson v. Hittle*, 163 B.R. 814, 818, n. 3.

matter of law".  It ordered that "NBI recover of and from White...on Counts I through VI,

the principal sum of $500,000, plus treble damages in the amount of $1,500,000; for a

total judgment as of June 25, 2008 in the amount of $2,000,000, together with costs".

19.    While not a model of detailed findings the State Court Judgment still may

have preclusive effect:

> Unfortunately, when a court is required to consider whether another
> court's prior decision operates as an estoppel, it is not always neatly
> presented with crisp, clean, specific and separately numbered findings of
> fact.  Instead, it may have nothing more than an ultimate conclusion which
> indicates that the plaintiff has prevailed under a particular theory.  State
> courts are not necessarily required to make particular findings of fact and
> conclusions of law....This lack of specific factual findings, whether from a
> court or a jury, will not prevent such a decision from operating as an
> estoppel.  In these circumstances, it may be necessary to look somewhat
> beyond the literal wording of the court's judgment in order to determine
> what facts a plaintiff necessarily had to prove to allow the finder of fact to
> come to its conclusion.

*Busick*, 264  B.R. at 525.  So, the mere paucity of detailed findings alone does not

defeat NBI's motion here.

### Count II - Check Fraud - Ind Code §35-43-5-12

20.    NBI prevailed under several theories in the State Court Judgment, among

them check fraud (Count II).  For NBI to have prevailed on the check fraud count, the

State Court must have found that White "knowingly or intentionally" obtained property

"through a scheme or artifice, with intent to defraud by issuing or delivering a check on

a financial institution knowing that the check ...will not be paid or honored by the

financial institution upon presentment in the usual course of business.  Ind Code §35-

43-5-12(b)(1)(A).  White argues that the check fraud statute does not require an actual

intent to deceive and does not require NBI to show it justifiably relied on White's

representations, both of which are essential to proving nondischargeability under

§523(a)(2)(A).

21.    Section 523(a)(2)(A) list three separate grounds for dischargeability:

actual fraud, false pretenses and false representation.  Although many courts have

applied the same test to all three grounds, the Seventh Circuit has distinguished

between the three grounds and has formulated two different tests, one for the "false

pretenses" and "false representation" grounds and another for the "actual fraud"

ground.  *In re Scarpello*, 272 B.R. 691, 699-700 (Bankr. N. D. Ill. 2002); citing *McClellan*

*v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000).    [2]

22.    NBI is proceeding on the "actual fraud" portion of §523(a)(2)(A).  To prove

nondischargeability under §523(a)(2)(A) for "actual fraud", the creditor must prove by a

preponderance of the evidence: (1) a fraud occurred; (2) the debtor intended to defraud

the creditor; and (3) the fraud created the debt that is the subject of the discharge

dispute.  *McClellan*, 217 F.3d at 894; *In re Hanson*, 428 B.R. 475, 487 (Bankr. N. D. Ill.

2010).  "Actual fraud" is broader than a misrepresentation or false pretenses and thus

is a less stringent standard because it requires neither proof of a misrepresentation by

the debtor nor justifiable reliance by the creditor.  *McClellan*  217 F.3d at 894.  Thus,

White's contention that the check fraud statute does not require reliance is of no

---

[2]The Court is mindful of, and White vigorously argues, the Seventh Circuit authority that holds that the mere writing of a check which later is returned for insufficient funds is not, in and of itself, a false representation.  *In re Scarlata (Goldberg Securities, Inc. v Scarlata),* 979 F.2d 521 (7th Cir. 1993).  The oft-cited *Scarlata* case, however, does not stand for the proposition that an NSF check that remains unpaid can never be held to be a nondischargeable debt.  What gets overlooked is that the defendant in *Scarlata* made good on the check the day after writing it.  It is the knowledge that one did not have the means to make good on the check when the check is written and, in fact, did not make good on the check that gives rise to a finding of nondischargeability, which distinguishes *Scarlata* from this case.  See, *In re Gard*, 327 B.R. 372, 375 (Bankr. N. D. Ind. 2003).

13

significance here.

23.    *McClellan* broadly defined fraud as follows:

Fraud is a generic term which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of the truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*McClellan*, 217 F.3d at 893.

24.    The check fraud statute clearly requires an intent to defraud, like the "actual fraud" portion of §523(a)(2)(A). It also provides that a perpetrator obtain property "through a scheme or artifice" with the intent to defraud and falls with McClellan's broad definition of "fraud" for §523(a)(2)(A) purposes. It is the property that White obtained (credit to the Account) through this fraud that is the subject of this dispute. The check fraud statute meets the criteria of what is required to prove "actual fraud" under §523(a)(2)(A) and therefore the State Court Judgment with respect to check fraud collaterally estops White from relitigating the issue of nondischargeability under Count I of NBI's complaint. The Court concludes that at least one of the counts upon which the State Court Judgment was based determined the issue of fraud for 523(a)(2)(A) purposes.

25.    White raised affirmative defenses with respect to his fraud liability which the State Court necessarily had to have considered and rejected in order to enter the State Court Judgment. To the extent the counts in the counterclaim filed in this adversary proceeding mirror these affirmative defenses, White is collaterally estopped from raising those counts here for the same reason he is collaterally estopped from

14

relitigating the issue of nondishchargeability.

26.    The State Court Judgment, however, does *not* collaterally estop White

from relitigating the *amount* of the nondischargeability judgment against him.  The State

Court held no damages hearing.  "Even when a *default judgment* is warranted based on

a party's failure to defend, the allegations in the complaint with respect to the amount of

the damages are not deemed true". (italics added), *Catt*, 368 F.3d at 793, quoting

*Credit Lyonnais Securities (USA) , Inc. v. Alcantara*, 183 F.3d 151, 154-55 (2nd Cir.

1999).  NBI argues that such a hearing was not needed because the amount to be

awarded was for a "sum certain".  That may be true, but there was no correlation

between the "sum certain" upon which NBI obtained its judgment and the actual

damages alleged by NBI.  Ind Code §34-24-3-1 allows NBI to seek damages in a civil

case for loss suffered as a result of violation of the check fraud criminal statute.

However, it limits recovery to an amount "not to exceed three (3) times the *actual*

*damages* of the person suffering the loss".  Here, the State Court Judgment was in the

amount of $2,000,000 which bears no relationship to: (1) that which is allowable under

Ind Code §34-24-3-1; (2) allegation #14 in the State Court Complaint, alleging an

overdraft (i.e, its actual damages) of $382,486.17; (3) paragraph #14 of the affidavit of

George Keely attesting that the dishonor of the Check caused an overdraft (actual

damages) of $382,486.17; (4) the demand letter of March 20, 2008 which made

demand for payment of $382,486.17; and (5) the restitution order in the criminal case in

the amount of $382,486.00. [3]   Since there is nothing in the State Court record to

support the award of *actual damages* of $500,000 upon which the State Court

Judgment is based, White is not collaterally estopped from relitigating the amount of the

nondischargeability judgment against him.  Nor is White collaterally estopped from

presenting any evidence with respect to the measure of damages.  Indeed, the fact that

White pled setoff as an affirmative defense in the State Court Action should have

prompted the State Court to hold a damages hearing.  Accordingly, the Court will

schedule a hearing on damages in order to determine the amount of the

nondischargeability judgment.

### *Order*

27.     There is no genuine issue of material fact and NBI is entitled to judgment

as a matter of law regarding the nondischargeability of the State Court Judgment.

There is a genuine issue of material fact regarding the amount of the State Court

Judgment.  Accordingly, NBI's motions for summary judgment on Count I and on

White's counterclaim are GRANTED only to the extent that they relate to the

nondischargeability of the State Court Judgment. To the extent NBI's motions for

summary judgment relate to the amount of the State Court Judgment, they are

DENIED.

**# # #**

---

[3] Recovery under Ind Code 34-24-3-1 is limited to three times the amount of "actual damages". To argue that it allows recovery for three times the face amount of the check would be nonsensical; had the facts here been that the $500,000 NSF check resulted in an overdraft of $10,000 (because there was $490,000 in the account against which the NSF check could be applied), it would be absurd for NBI to argue that it was entitled to a judgment of $2,000,000.  The fact that the overdraft was $382,486.17 rather than $10,000 doesn't matter.  In either case, the actual damages would have been the amount of the overdraft.

Distribution:

Brock Jordan, Attorney for NBI, Plaintiff
Christine Jacobson, Michael Hile, Attorneys for Christopher White, Defendant
Case Trustee